[Crim. No. 6589. In Bank. May 4, 1960.]

THE PEOPLE, Respondent, v. RENO ORLANDI et al., Appellants.

THE PEOPLE, Respondent, v. ANTHONY SEPIC, JR., Appellant.

Falk & Falk, Robert C. Dunn, Mathews & Traverse, Francis B. Mathews and Charles V. Moore for Appellants.

Stanley Mosk, Attorney General, Doris H. Maier and Raymond M. Momboisse, Deputy Attorneys General, for Respondent.

McCOMB, J.—After trial before a jury, defendants Reno Orlandi, Emerick Sepic and Anthony Sepic, Jr., appeal from judgments of receiving stolen property. In addition, there are appeals from orders denying their motions for a new trial. Don Petty was also indicted for receiving stolen property, but the charge against him was dismissed and he was used as a witness on behalf of the People.

*Facts*: In May 1958, the Eureka Supermarket purchased 100 cases of liquor. Each case when shipped had stenciled on top the invoice number, which was also the shipping number.

On June 6, 1958 two 17-year-old boys, Short and Lovett, entered the Eureka Supermarket after closing time and stole 12 or 13 cases of hard liquor of various brands. They placed them in a car they had parked outside the market and proceeded to deliver them to Mr. Peeples. About a month later the boys again entered the market, using the same procedure, and this time took 15 cases of liquor.

Before taking any of the liquor the boys had made arrangements with Peeples to sell it to him. For the first cases they received a 1954 automobile engine worth about $250. At wholesale, the liquor was worth from $37 to $50 a case. For the last cases the boys were to have received $100, but actually did not receive anything. The wholesale value of the last group of cases was about $550.

Shortly after receiving the first 12 or 13 cases, Peeples contacted Petty, who at that time was a salesman for a second-hand automobile concern, partly owned by defendant Anthony Sepic. Peeples offered to sell 10 or 12 cases of whisky to Petty, but Petty did not want to buy. Peeples

asked him if he knew anyone who might buy, and Petty asked if the whisky was "hot." Peeples assured him that it was not and asked Petty to inquire around to see if anyone among his acquaintances would buy. Petty talked to defendant Orlandi and to defendant Anthony Sepic, the former a licensed liquor dealer. He told them of Peeples' offer to sell liquor. Sepic asked him to ascertain the price. Petty contacted Peeples, and a price ranging from $2.50 to $3.50 per fifth was set.

Orlandi agreed to purchase the liquor, and Peeples brought the liquor in his car to the used-car lot where defendant Anthony Sepic conducted his business. Peeples left his car on the lot with the whisky inside the trunk. Shortly after he left, Orlandi arrived in his panel delivery truck. He parked the truck beside Peeples' car. When the trunk of Peeples' car was opened, Anthony Sepic, Orlandi and Petty were present. The liquor was not in the original cases, but was stacked loosely in the trunk of the car. All three men took part in transferring it from Peeples' car to Orlandi's truck. Orlandi did not have enough money to pay for the whisky, and Petty advanced $80 toward the total amount, which he later received back. Anthony Sepic also advanced some money. Petty took the money to Peeples, who gave Petty a case of vodka.

Petty contacted the police and informed them of the transfer that had been made and asked whether any whisky had been reported stolen. Several days later the officers told him they had no record of any whisky having been stolen and that as far as they knew the whisky he had dealt with was not stolen.

Shortly after July 4, 1958, Orlandi asked Petty if any more liquor was available. Soon thereafter Peeples told Petty that he did have more whisky, and Petty told Peeples that Orlandi had inquired and was interested in purchasing more. Petty then told Orlandi that Peeples had more liquor, and the same arrangements were made to transfer it as in the first transaction. This time there were between 13 and 15 cases involved. Peeples borrowed an old sedan from the used-car lot, loaded it with the liquor and took it back to the same place where he had left the first quantity of liquor. Orlandi came in his panel truck, and the liquor, which was in cases this time, was transferred to it.

None of the cases had any identifying marks on them. Peeples was paid about $300 for this second lot. Orlandi paid Petty, and Petty turned the money over to Peeples, receiving two cases of whisky for his own use. After this second trans-

action Petty again contacted the police and told them about the transfer.

Several days later Peeples again contacted Petty and told him that he had two more cases of whisky that he wanted to get rid of in a hurry. Petty told Anthony Sepic of this, and Sepic gave Petty $40, which was about one half the wholesale price of the liquor. Petty took the money back to Peeples and gave him $30, keeping $10. This time when the trunk of Peeples' car, which was again used to deliver the liquor, was opened, Petty observed that "Eureka Supermarket" was stenciled on the two cases. He remarked, "This whisky is from the Eureka Supermarket," whereupon Peeples ripped the identification off the cases and then drove his car to a shed on the used-car lot and put off the two cases of whisky. About 30 to 45 minutes later, Anthony Sepic took this liquor in his automobile. Again Petty told the police what had occurred.

Up to this time Emerick Sepic had not been known in the transaction so far as the record shows, but around October 9, 1958, while officers were searching for a mental patient who had escaped, they entered the barn of Mrs. Frances Sepic, who is the mother of Emerick Sepic and with whom Emerick was living. In the barn the officers discovered two cases of whisky concealed under a pile of hay. The identification marks had been removed.

On the following day the officers returned to the residence of Mrs. Sepic and talked with her. After leaving, they parked their car in a position where they could observe the barn. They saw Emerick run from the back of the house to the barn, and as they approached heard the rattle of bottles. Emerick was discovered carrying a case containing whisky and when asked what he had, said, "Here, take it." He then told the officers that there was more whisky "over by the stalls." He told confusing stories to the officers as to how he had obtained the liquor, claiming at one time that it had been given to him by a friend and at another that he had just found the liquor behind his place of business.

These are the only questions necessary for us to determine:

First. *Did the trial court err in instructing the jury as follows*: "One who, under the direction of an officer of the law or of any other person, or upon his own initiative, and without criminal intent, feigns complicity in the commission of a crime merely for the purpose of detecting the perpetrator thereof, with a view to prosecution for the offense, is not an accomplice in law, and his testimony need not be corroborated.

To support a conviction, however, such testimony and all other evidence, if any, tending to prove guilt must carry the convincing force required by law."

*Yes.* The foregoing instruction defined for the jury what the court meant by "feigned accomplice."

There is no evidence in the record that would support a finding that Petty was a "feigned accomplice," as defined in the instruction.

The evidence shows either that Petty knew the property was stolen or that he did not have such knowledge. There is no evidence from which it could be inferred that he "feigned complicity in the commission of a crime merely for the purpose of detecting the perpetrator thereof, with a view to prosecution for the offense."

Petty did not go to the police until after the first transaction had been completed. Likewise, there is no evidence from which it could be inferred that he initiated the transaction or assisted in its completion for the purpose of "detecting the perpetrator" of the offense "with a view to prosecution for the offense." He testified that "three days to a week" after the first transaction was completed, he saw Sergeant Bryant of the Eureka Police Department "walking by on his road to work and I called him in his office there and I told him, 'Sergeant, I've gotten into something that I have no business of even meddling with,' and . . . I asked him if there was any, to his knowledge, any whisky that had been stolen. I said I was told this whisky was not hot and, however, I said, it's just an accumulation of things that put it out in my mind. . . .''

This evidence indicates that Petty had become concerned that he might get into trouble because of his part in the transaction and went to Sergeant Bryant, with whom he was acquainted, in the hope that if anything developed involving himself, his having contacted the sergeant would operate in his favor.

Mr. Presiding Justice Van Dyke, in the opinion prepared by him for the District Court of Appeal, (Cal.App.) 345 P.2d 311, 315 accurately stated: "The instruction wrongfully gave to the jury an alternative in their consideration of the status of Petty as an accomplice. Had the instruction on feigned complicity not been given, the jury might well have found from the evidence that Petty was an accomplice and in that event they would have obeyed the trial court's admonition that in such case they must find a verdict of not guilty as to Orlandi and Anthony. But the jury were by

the feigned complicity instruction given an opportunity to avoid a finding of complicity upon the theory that what Petty did could be explained away because he was merely feigning complicity and therefore that his testimony did not have to be corroborated.''

██ Second. *Did the trial court err with respect to defendant Emerick Sepic in instructing the jury as follows*: ''If you find that the witness Petty was an accomplice of the defendant Emerick Sepic, then you will consider whether the testimony of the witness Petty has been corroborated in accordance with my instructions. If however you find that the witness Petty was not an accomplice as to any party to this action, then the rule that his testimony be corroborated does not apply and you will judge the case from all of the evidence and the instructions which I give you.''

*Yes.* The foregoing instruction was erroneous as to defendant Emerick Sepic. There is no evidence in the record from which it could be found that Petty was his accomplice.

The only evidence against him was with relation to the two cases of whisky found under the hay in his mother's barn on the farm where he lived. Petty's testimony in no way involved Emerick.

The court, by telling the jury that the evidence was such that they could find that Petty was an accomplice of Emerick, only tended to confuse them, and it suggested that the case against Emerick was far stronger than it was in fact. He was not shown in any way to have had anything to do with the purchase of the liquor by his brother. All that he did may have been done only because he knew where his brother had hidden it.

In view of our conclusions it is unnecessary to discuss other questions argued by counsel.

The judgments are reversed.

Gibson, C. J., Traynor, J., Schauer, J., Peters, J., White, J., and Dooling, J. pro tem.,* concurred.

---

*Assigned by Chairman of Judicial Council.